(No. 58481.—

*In re* LARRY EUGENE PAUL, a Minor (The People of the State of Illinois, Appellant, v. Kathryn Steele, Appellee).

*Opinion filed March 23, 1984.*

Neil F. Hartigan, Attorney General, of Springfield, and Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and Rebecca L. White, of the State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

Frederick M. Grosser, of Champaign, for appellee.

JUSTICE WARD delivered the opinion of the court:

This appeal is from a decision by the circuit court of Champaign County adjudging Kathryn Steele to be an unfit parent of Larry Paul, a minor, and terminating her parental rights. The appellate court reversed, holding that the State failed to prove by clear and convincing evidence that Mrs. Steele was unfit. (113 Ill. App. 3d 1171 (Rule 23 order).) We granted the State's petition for leave to appeal under Rule 315 (87 Ill. 2d R. 315).

Larry Paul is the child of Kathryn Steele and James Paul, a former husband. Larry has a slight case of cerebral palsy and is mildly mentally retarded. He attends special education classes. In addition, Larry has esotropia and requires strong corrective lenses. Kathryn Steele is mildly mentally retarded herself and completed nine grades of schooling. Mrs. Steele also suffers from occasional epileptic seizures. Her employment has been in minimum-wage jobs. Kathryn divorced Paul and later married Anthony Steele, Larry's stepfather, in December 1978. Larry was one of three children living in the Steele home. Jason Wayne Paul, another son of Kathryn's marriage to Paul, and Richard Lee Reed, a child of a previous marriage, also reside with the Steeles.

According to a report by the Department of Children and Family Services (the Department), Larry had come to school "dirty and tired" on several occasions in October 1978. A homemaker was appointed to assist Mrs.

Steele with household tasks. According to further reports by the Department, the school reported Larry to be in need of a bath and without his glasses for five days in succession in October 1979. On two occasions, the school found bruise marks on Larry's arms and legs, and on one occasion found a burn mark on Larry's hand.

On October 13, 1979, the State filed a petition under the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—1 *et seq.*) to have Larry adjudged a neglected minor and declared to be a ward of the court. Three counts of neglect were set out in the petition. Count I alleged that Larry's environment was "injurious to his welfare." Count II alleged that Larry was "neglected" by his mother and stepfather. Count III alleged that Larry's environment was injurious to his welfare and charged that he reported to school with "a bruised neck and cigarette burn" and "had marks and bruises on his arms and legs."

The trial court conducted an adjudicatory hearing at which the State dismissed counts II and III, and the parties stipulated to the charge in count I. The trial court, however, did not make a finding of physical abuse as section 4—8 of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 704—8) requires if physical abuse is the basis of the court's finding of neglect. One infers that here physical abuse was not the basis of the court's finding. At the dispositional hearing on March 28, 1980, the court adjudged Larry to be a neglected minor, declared him a ward of the court, and appointed the Department permanent guardian with authority to place the child in accordance with his best interests.

The Department did not immediately take custody of Larry, and he continued to live with his mother. Six months later, Larry was placed in his first foster home. The purported reason for doing so at that time was Mrs. Steele's financial inability to buy a new pair of glasses

for Larry. The Department, it was claimed, could purchase glasses for Larry only if the child was living in a foster home. A schedule was arranged to allow Mrs. Steele to visit with Larry twice a month. In the following 17 months, Mrs. Steele missed eight visits. The caseworker testified that Larry became upset when Mrs. Steele missed her visitation appointments, and that Larry sometimes did not wish to see his mother. During this period of Larry's foster care, Mrs. Steele moved several times. She testified that these moves were caused by financial problems and the poor condition of some of the places she had rented.

In July 1981, Larry was moved to a second foster home because the first foster parents were moving from Illinois. By December 1981, the second foster parents had expressed to the Department their desire to adopt Larry. On December 3, 1981, the Department caseworker completed a report to the State's Attorney of Champaign County, recommending that parental rights be terminated and a guardian be appointed with the authority to consent to Larry's adoption.

On December 18, 1981, Mrs. Steele reported that she had moved to Newton to join her husband, who had found employment there. She requested that Larry be transferred to a foster home in Newton. Although this would have been a "priority transfer" under the Department practice, the caseworker told Mrs. Steele this could not be done. Mrs. Steele then requested that her visits be reduced to one a month because of the expense of traveling to visit Larry, and she asked that her case file be transferred to the Department office in Newton. According to the Department, it attempted to send the file to Newton, but the file was "misplaced," and it did not reach Newton for several months, during which time a proceeding was begun to terminate Mrs. Steele's parental rights.

The caseworker filed his report to the State's Attorney on December 21, 1981. On April 2, 1982, the State's Attorney filed a supplemental petition to declare Mrs. Steele and James Paul unfit parents of Larry and to terminate their parental rights. The petition charged Mrs. Steele to be unfit on the following grounds which are set out in section 1(D) of the Adoption Act: (1) failure to maintain a reasonable degree of interest, concern or responsibility with respect to Larry's welfare (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(b)); (2) failure to make reasonable efforts to correct the conditions which led to the removal of Larry (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(m)); (3) failure to make reasonable progress toward the return of Larry after the adjudication of neglect (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(m)); and (4) failure to plan for the future of Larry (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(n)).

In July 1982, the circuit court conducted an adjudicatory hearing on the supplemental petition. On July 21, 1982, the court held that Mrs. Steele was unfit on all four grounds alleged in the petition. Subsequently, at the dispositional hearing on the unfitness petition, the circuit court held that it was in the best interests of Larry to terminate the parental rights and appoint a guardian with the authority to consent to adoption.

The only question on this appeal is whether the trial court's judgment that Mrs. Steele was unfit was supported by clear and convincing evidence. She argues that it was not, because her behavior during Larry's foster care would not support the allegations in the petition. The State contends that her missed visits and frequent household moves sufficiently support the trial court's findings.

The parental rights of a nonconsenting parent may be terminated only upon an adjudication of unfitness. (Ill. Rev. Stat. 1981, ch. 37, par. 705—9(3).) Parental rights

and responsibilities are of deep human importance and will not be lightly terminated. (*In re Hoback* (1981), 95 Ill. App. 3d 169, 170.) The grounds which will support a finding of unfitness are set out in section 1(D) of the Adoption Act. (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D).) Grounds upon which the court found Mrs. Steele to be unfit were:

"* * *

(b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

* * *

(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor * * *.

(n) evidence of intent to forego his or her parental rights as manifested by his or her failure for a period of 12 months:** [to] plan for the future of the child, although physically able to do so." Ill. Rev. Stat. 1981, ch. 40, pars. 1501(D)(b), (m), (n).

A finding of parental unfitness must be supported by clear and convincing evidence. (*In re Brown* (1981), 86 Ill. 2d 147.) The first ground upon which the trial court found in favor of the State was subsection (b), the standard of failure to maintain a reasonable degree of interest, concern or responsibility with respect to the child's welfare. The trial court did not make any specific findings of fact, nor did it state the evidence it deemed supported its finding on the standard. The evidence supporting this finding is, presumably, Mrs. Steele's missed appointments with her son. Mrs. Steele, however, did keep 23 out of 31 possible opportunities to visit her child. She reduced the frequency of the visits only after she moved away to join her husband. That Mrs. Steele herself has personal difficulties, including poverty and being subject to seizures, should not be over-

looked. Not keeping eight visits, which was not shown to have been caused sheerly by neglect or indifference, does not constitute clear and convincing evidence of a lack of concern for the child. Her moving to Newton was not done in neglect of the child, but was done so that she and her other children might join her husband.

We consider that the trial court erred also in holding that an order of parental unfitness could properly be based on subsection (m) (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(m)). Subsection (m) concerns the failure of a parent to correct the conditions which were the basis for the child's removal from the parent or the failure of the parent to take steps to warrant the return of the child to the parent's custody. The basis for the removal of Larry from his mother's home was, incredibly, the financial inability of Mrs. Steele to purchase new eyeglasses for him. Plainly, subsection (m) was not applicable to that situation. The factors set out in this subsection are not involved in the mother's inability to buy new glasses for Larry.

Finally, the trial court, in effect, held that Mrs. Steele waived her parental rights in that she had failed to plan for the future of Larry (Ill. Rev. Stat. 1981, ch. 40, par. 1501(D)(n)(iii)). We do not consider that the evidence showed failure on the part of Mrs. Steele to plan for Larry's future within the meaning of the statute. The section in part states that "the court may consider but shall not require a showing of diligent efforts by an authorized agency to encourage the parent to perform the acts specified in subsection (n)." Although the trial court is not required to consider diligent efforts of the agency to develop the parent-child relationship, a failure to plan for a child's future is not a proper ground for a finding of unfitness if there is evidence that the agency discouraged or frustrated a promotion of the parent-child relationship. We believe that was the case here. The trial court's first action was to hold Larry to be a neglected child. His home situation,

however, must have been considered satisfactory by the Department, for the agency deemed it unnecessary to transfer the custody of the child from the mother at that time. In a baffling action six months later, the agency placed Larry in a foster home because, the Department stated, his mother was financially unable to buy new glasses for him. Thus, the child was removed from his mother's custody for less than a convincing reason. Further, when Mrs. Steele moved to Newton, the caseworker informed Mrs. Steele that the child could not be moved, although we are told that under Department practice this would have been a "priority transfer" of the child. When Mrs. Steele asked that the case file be transferred to the Department office in Newton, the file was misplaced and did not reach the office in Newton for several months, during which time the proceeding had been begun to terminate the mother's parental rights. Against this background, it cannot be reasonably said that there could be a supportable holding under subsection (n) that Mrs. Steele failed to plan for the future of her child.

Considering all things, we do not consider that termination of this woman's parental rights was warranted. She was employed the greater part of the period when her child was in foster care. She and her other two children moved to Newton in order to join her husband, who had found employment there and thus keep the family intact. Mrs. Steele accepted homemaking counseling and services and apparently the home was reasonably maintained. Her other two children seemed to have been cared for adequately. Here, apparently, it was considered that the foster parents could offer a home of greater opportunity in some respects than the natural mother could provide. The custody of the child, however, cannot turn on such a decision; it should turn on the question of whether or not Mrs. Steele is unfit to have custody of the child. A judgment that a parent is unfit to rear his or her own child is one of

the most devastating of judicial decisions. A fundamental right is involved; parents have rights superior to others, including the State, in the rearing of their child unless it is shown by clear and convincing evidence they have forfeited one of mankind's most important rights.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*