2025 IL App (1st) 241464-U

SIXTH DIVISION
January 17, 2025

No. 1-24-1464

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.G., a minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 JA 460 |
| | ) | |
| Alberto C., | ) | Honorable |
| | ) | Jennifer Payne, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Gamrath concurred in the judgment.


**ORDER**

¶ 1    ***Held:***    We affirm the circuit court's orders finding appellant Alberto C. unfit and
terminating his parental rights because the record supported the conclusions that

(1) he did not act with reasonable responsibility, and (2) termination was in the best interests of his child.

¶ 2    In this child custody matter, appellant Alberto C. appeals from the circuit court's orders finding him unfit as a parent and then terminating his parental rights, arguing that the record did not support the State's alleged grounds for unfitness, and termination was not in his child L.G.'s best interests. We affirm.

¶ 3                                                    BACKGROUND

¶ 4    On May 3, 2019, the State filed a petition for adjudication of wardship for L.G., alleging he was neglected due to an injurious environment based on an incident on April 24, 2019, after which L.G. was "hospitalized and diagnosed with bilateral, chronic subdural hematomas" that medical personnel described as "non-accidental trauma." The petition noted that Alberto and L.G.'s mother, Lisbeth, had a "history of domestic violence," with an order of protection "previously" in place.[1] The State also alleged the separate ground of abuse, based on L.G. (1) sustaining physical injury and (2) being at substantial risk of physical injury.

¶ 5    On May 6, 2019, the circuit court found probable cause existed that L.G. was abused or neglected per the State's petition and granted temporary custody with right of placement to the Department of Children & Family Services (DCFS). The court later adjudicated L.G. abused or neglected. On September 22, 2020, the court entered a disposition order adjudicating L.G. a ward of the court, and placed him in DCFS custody with right to placement. A permanency order entered the same day set a goal of return home within 12 months. A subsequent permanency order from February 18, 2022, maintained this goal, and indicated Alberto had made "some progress" towards L.G.'s return home, including that he was "visiting weekly and engaging in services."

---

[1] Lisbeth also had her parental rights terminated, but is not a party to this appeal.

¶ 6 On September 20, 2022, the circuit court entered an order changing L.G.'s permanency goal to substitute care pending termination of parental rights. The State's supplemental petition for appointment of a guardian with the right to consent to adoption listed 750 ILCS 50/1(D)(b) and (m) (West Supp. 2021)) as grounds for termination ("ground (b)" and "ground (m)," respectively).[2]

¶ 7 The circuit court held proceedings on the State's petition on June 24, 2024. During the termination of parental rights portion of the hearing, the parties stipulated to certain exhibits. Included in these exhibits were documents from Alliance Behavioral Services, Inc., which indicated Alberto was diagnosed with THC use disorder in October 2018, and completed 20 hours of treatment on April 25, 2019. Additionally, in notes from Alberto's individual therapy sessions starting on September 17, 2021, Alberto acknowledged issues with marijuana and alcohol. The therapist indicated that Alberto "cannot recognize how his substance abuse may have contributed to his involvement" with DCFS and had "picked up a claim involving a weapon" during his treatment, but was also "currently providing consistency and a supportive environment for his son." In a May 24, 2022 letter, Alberto's therapist severed the treatment arrangement because Alberto had missed three consecutive appointments. Drug testing results in the exhibits showed Alberto tested positive for THC on multiple occasions throughout L.G.'s time in DCFS custody, including at least once in each year from 2019 to 2022.

¶ 8 The exhibits also included a series of DCFS service plans. In the DCFS service plan dated November 21, 2019, Alberto reported that he struck Lisbeth while she was pregnant with L.G. He was arrested, charged with battery, and a restraining order was entered against him. Alberto's progress with services for substance abuse and domestic violence were both evaluated as

---

[2] The State specified three separate nine-month periods for ground (m): (1) November 1, 2020 to August 1, 2021; (2) August 1, 2021 to May 1, 2022; and (3) May 1, 2022 to February 1, 2023.

"Satisfactory Progress/Maintain Intervention." Regarding substance abuse, the plan indicated Alberto had completed 75 hours of intensive outpatient treatment, and was recommended for further outpatient treatment. His visitation with L.G. was described as unsatisfactory because of sporadic attendance. Alberto also earned a satisfactory description for substance abuse and domestic violence services in the April 30, 2020 service plan.

¶ 9    In the November 4, 2020 service plan, Alberto's progress evaluation was changed to unsatisfactory on these services, with indications that he had not completed the recommended outpatient substance abuse service or domestic violence services. Visitation also remained inconsistent. The November 4, 2021 service plan, however, again rated him satisfactory in his progress with substance abuse and domestic violence services. He had completed the domestic violence service on March 3, 2020, such that the service could be discontinued. Visitation was also now described as satisfactory, with Alberto attending each visit and supplying L.G. with "appropriate snacks, toys, and activities." Finally, the May 18, 2022 service plan also rated Alberto satisfactory for the services of substance abuse, domestic violence, and visitation, and indicated substance abuse services could be discontinued.

¶ 10    In a "Domestic Violence Assessment" form also contained in the exhibits, dated March 31, 2023, Alberto indicated he drank alcohol four times a month, typically consisting of four drinks per occasion. He also reported using marijuana 20 times and cocaine 6 times in 2022. He last drank alcohol and used cocaine eight days before the assessment. He indicated he was using drugs or alcohol at the time he accrued the offense leading to the assessment, as was his "partner." Alberto also self-reported two domestic battery arrests and a DUI. He indicated that Lisbeth currently had an order of protection against him. The order was prompted because Alberto punched her "in the face twice." He had been charged with violating an order of protection in the past. The assessment

further noted Alberto stated he punched Ms. Gonzlez "in the face multiple times"; that "physical violence *** happened because they both don't understand each other and drugs was a part of the situation"; and he felt embarrassed and "took full accountability" for the physical abuse.

¶ 11    During the fitness portion of the June 24, 2024 proceedings, the State called Cardazure Selph, L.G.'s case manager. Selph, who assumed L.G.'s case in June 2022, testified there was an incident of domestic violence between Lisbeth and Alberto around her start date. Lisbeth informed Selph that police arrested Alberto following the incident. Alberto's conduct violated a then-current order of protection. Another incident of domestic violence between Alberto and Lisbeth occurred in February 2024. Before the incident, Alberto and Lisbeth had contact in January and August of 2023, despite the order of protection. Lisbeth told Selph that during the February 2024 incident, she and Alberto were drinking together. Following an argument, Alberto "started hitting *** and grabbing" Lisbeth, who suffered a "busted" lip. During questioning by the circuit court, Selph stated that Lisbeth did not indicate whether she needed medical treatment after the incident.

¶ 12    Specific to Alberto's participation in services, Selph testified that he twice completed a domestic violence program, first in March of 2020, then again in February 2024 (preceding the February 2024 incident). Given the incident, Selph believed Alberto required additional domestic violence counseling. Alberto also did not complete the services of individual therapy or the Nurturing Parenting Program. Regarding substance abuse, Alberto resumed treatment through Alcoholics Anonymous (AA) in April 2024 in response to Selph's request. Alberto never completed a parenting capacity assessment because he "did not complete enough services to be referred." Finally, Selph never recommended unsupervised visits between Alberto and L.G., though Alberto did visit consistently and with no reported concerns.

¶ 13    On cross-examination by the attorney for the public guardian, Selph testified that L.G. had special needs based on an autism diagnosis.

¶ 14    On cross-examination by Alberto's attorney, Selph agreed that Alberto participated in parenting coaching, but this service stopped when L.G.'s permanency goal changed. Alberto never refused services. Selph believed Alberto was intoxicated during a school program in July 2024 because he was incoherent. When asked if L.G. and Alberto had a bond, Selph testified that L.G. knows who Alberto is, but she never heard him refer to Alberto as "father" or "Dad."

¶ 15    Alberto testified in his case in chief, confirming that he completed services for domestic violence and substance abuse, and was still engaged in certain services, including individual therapy. His visitations were limited to once a month after L.G.'s permanency goal changed, and he always attended. Alberto provided L.G. with toys, clothing, and food during these visits. He believed he had a bond with L.G., who calls him "Papa." Alberto denied he was intoxicated at the event Selph described.

¶ 16    On cross-examination by the attorney for the public guardian, Alberto answered "Yes" to the question of whether, considering the February 2024 incident, he needed both additional substance abuse treatment and domestic violence counseling.

¶ 17    Following argument, the circuit court found Alberto unfit on all alleged grounds, including all three time periods for ground (m), and specifically on the "responsibility" aspect of ground (b). In so finding, the court noted Alberto had two documented domestic violence incidents since the case had been with DCFS, and stated in relevant part, "It is one thing to engage in services and another thing to learn from those services." The court called the evidence of the February 2024 incident "unrebutted." It continued, on ground (b), that while Alberto showed interest and concern, his behavior did "not show responsibility."

¶ 18   The matter moved to the best interest phase, during which Selph again testified. She stated that L.G. had been in the same foster home placement since 2021 with "relative specialized foster" parents. The home is safe and appropriate. Selph had no concerns about whether L.G. received necessary services for his special needs. He is integrated into the foster parents' extended family, including visiting the family in Texas, and had a bond with his foster parents, whom he called "Momma" and "Pop." Selph believed adoption by the foster parents was in L.G.'s best interests.

¶ 19   During cross-examination by counsel for Alberto, Selph testified that L.G.'s foster parents initially "had some concerns" about adoption. On redirect, Selph testified that the foster parents did not waiver on providing permanency for L.G., and only had concerns on deciding between adoption and guardianship. On questioning from the circuit court, Selph stated that L.G.'s foster parents have brought L.G. to events at his paternal grandmother's home, and confirmed they expressed willingness to maintain contact between L.G. and his biological parents.

¶ 20   Everado R., L.G.'s foster father, testified that he and his wife wanted to adopt L.G. because they love him and his home was "the best place" for L.G., who was healthy, growing, and doing well in school. Everado described L.G. as a "great little kid." During cross-examination by the attorney for the public guardian, Everado stated regarding whether they would permit L.G. to maintain contact with his biological parents, "You know, we haven't discussed that yet, but it might be." He agreed they would do what they thought was in L.G.'s best interest.

¶ 21   During cross-examination by counsel for Alberto, Everado confirmed that when he and his wife were considering guardianship, they had informed DCFS they were planning to move to Texas. That move was currently "on hold" pending resolution of L.G.'s case. On questioning from the circuit court, Everado stated there were no current visits between L.G. and his siblings, and he did not have the siblings' father's contact information.

¶ 22 Alberto again testified on his own behalf, stating he believed he and L.G. were bonded because L.G. hugged him, and they played and ate together during visits, which Alberto believed L.G. enjoyed. He believed maintaining his parental rights was in L.G.'s best interest because, "I feel like if I show him and he probably show me a better future."

¶ 23 Following argument, the circuit court terminated Alberto's parental rights and appointed a guardian with the right to adoption. The court explained that it believed this result was in L.G.'s best interests because he had been in the system for over four years and "deserves permanency," he had special needs for which the foster parents provided, he referred to his foster parents as his mother and father, and "they have always been willing to provide for permanency." The court continued that it was Alberto's own testimony which showed he "acknowledges that he needs to do domestic violence therapy, and individual therapy and substance abuse treatment," and thus was not yet ready for L.G.'s return.

¶ 24 The circuit court entered orders on June 24, 2024, terminating Alberto's parental rights on both grounds (b) (as to responsibility only) and (m) (as to each alleged nine-month period), and setting a permanency goal of adoption. This appeal followed.

¶ 25                                JURISDICTION

¶ 26 The circuit court terminated Alberto's parental rights on June 24, 2024, and he filed his notice of appeal on July 17, 2024, giving this court jurisdiction pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 27                                  ANALYSIS

¶ 28 On appeal, Alberto argues the both the circuit court's fitness findings and best interest finding were against the manifest weight of the evidence.

¶ 29 The termination of parental rights is governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). The Juvenile Court Act delineates a two-step process to determine whether a parent's rights may be involuntarily terminated. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). In the first part, the State must prove the parent is "unfit" (per the terms of the Adoption Act) by clear and convincing evidence. *Id.* If the court finds a parent unfit, the matter moves to the second stage, where the State must demonstrate by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Both determinations are factual findings by the lower court, and thus cannot be reversed on appellate review unless they are against the manifest weight of the evidence, meaning the opposite conclusion is apparent form the record, or the decision is unreasonable, arbitrary, or based on something outside of the record. See *In re D.D.*, 2022 IL App (1st) 220410, ¶ 65; *In re A.R.*, 2023 IL App (1st) 220700, ¶ 77.

¶ 30 We begin with the circuit court's fitness findings. The court found Alberto unfit based on two of the grounds listed in the Adoption Act: he failed to (1) maintain "a reasonable degree of interest, concern or responsibility" as to L.G.'s welfare, and (2) "make reasonable efforts to correct the conditions that were the basis for removal of the child from the parent during any 9-month period" or "to make reasonable progress toward the return of the child during any 9-month period." 750 ILCS 50/1(D)(b), (m) (West Supp. 2021). "Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness." *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). Accordingly, if we find the circuit court did not err in finding Alberto unfit on either ground, we will affirm.

¶ 31    We find the circuit court's decision that Alberto was unfit based on 750 ILCS 50/1(D)(b) (West Supp. 2021) was not against the manifest weight of the evidence and affirm the unfitness finding on this basis alone. The court specifically delineated that Alberto failed the "responsibility" aspect of ground (b), which is a separate and distinct requirement. See *D.D.*, 2022 IL App (1st) 220410, ¶ 73. The record supports this conclusion. While Alberto demonstrated interest and concern through his steady improvement in general service completion and visitation, he also consistently demonstrated a lack of responsibility by engaging in problematic behaviors despite completing services related to them and despite his knowledge that continuing these behaviors put his parental rights at risk. This is sufficient to demonstrate lack of responsibility per ground (b). *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶¶ 29-30; see also *In re E.O.*, 311 Ill. App. 3d 720, 727 (2000).

¶ 32    Alberto continued to abuse alcohol and marijuana throughout L.G.'s time with DCFS (as evidenced by the therapist notes and positive drug tests), despite his engagement in AA and other substance abuse treatments. Similarly, Alberto twice completed domestic violence services while L.G. was involved with DCFS, but then continued to physically abuse Lisbeth, including an incident in May or June of 2022 and, perhaps most concerningly of all, another in February 2024. Thus, the record is clear that Alberto, despite knowing it was incumbent upon him to stop using substances and physically abusing women, continued to abuse substances, and committed at least two new domestic violence offenses. This conduct shows lack of responsibility per ground (b). *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 30.

¶ 33    The February 2024 incident warrants further discussion. Five years after L.G. entered the system, with domestic violence a specific concern and with the problems that occurred when Alberto and Lisbeth drank together well-documented, Alberto nonetheless decided to again drink

alcohol with Lisbeth, which lead him to once again physically abusing her. This occurred later in the same month that Alberto completed a domestic violence service. This conduct does not prove that Alberto does not love L.G., or indeed that Alberto cannot act with interest or concern for him; but it does demonstrate that despite Alberto's best efforts, he is unable to avoid engaging in the very kind of irresponsible, violent, and criminal conduct which first placed his status as a custodial father at risk.

¶ 34    Alberto argues that termination based on ground (b) was inappropriate because he showed interest and concern for L.G., pointing to his consistent visitation record, the completion of substance abuse services, engagement with AA, completion of domestic violence services, and the "satisfactory" overall progress noted in multiple DCFS service plans. This argument fails because even conceding Alberto's characterization of the record on these points, he cannot refute that he failed to act responsibly, as explained above. See *D.D.*, 2022 IL App (1st) 220410, ¶ 73 ("finding of unfitness may be found based on a failure of any one of the three elements" of ground (b)).

¶ 35    We also reject Alberto's argument challenging the State's evidence on his domestic violence issues because the protective orders themselves are not in evidence. Alberto acknowledged in his testimony that the February 2024 incident occurred, and considering the incident, he needed additional services. This is the operative portion of the record, and whether the evidence also sufficed to show the incident constituted a violation of a protective order is irrelevant.

¶ 36    Finally, Alberto argues that Illinois law maintains it is a parent's efforts, not the success of those efforts, which a court considers in deciding whether the parent acted with reasonable interest, concern, or responsibility. See *Id.* ¶ 74; see also *In re Gwynne P.*, 346 Ill. App. 3d 584, 591 (2004). Under this interpretation, Alberto contends that his engagement in services shows consistent effort at reunification, even if he was unsuccessful in avoiding relapses in problematic behavior.

¶ 37 This argument fails because it overextends the caselaw in this area. First, this principle primarily applies to whether a parent is making reasonable efforts to show concern or interest and not in the context of responsibility. See *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990) ("a court is to examine the parent's efforts to communicate with and show interest in the child not the success of those efforts"). Moreover, the cases typically involve a situation where a parent's efforts to show interest or concern are thwarted by circumstances beyond their control, such as whether a court or caseworker permitted a certain level of contact. See *D.D.*, 2022 IL App (1st) 220410, ¶ 84 (issues with parent's service completion attributable to "confusing" and "contradictory" agency actions); *Gwynne P.*, 346 Ill. App. 3d at 593 (parent's visitation issues were due to incarceration and agency failures); *E.O.*, 311 Ill. App. 3d at 727 (a parent's mental health struggles does not alone constitute grounds for an unfitness finding if the parent makes reasonable efforts to account for them). Here, the circumstances under which Alberto could make a reasonable effort to be responsible were *not* beyond his control (even providing for the challenges of addiction, which this court does not diminish). Instead, it was Alberto's own decision to drink alcohol with Lisbeth, and Alberto's own personal conduct in again physically abusing her. Thus, we reject his invocation of the "effort, not success" principle. See *In re Jaron Z*, 348 Ill. App. 3d 239, 259-61 (2004) (continued drug use despite substance abuse services supported lack of responsibility).

¶ 38 Alberto next challenges the circuit court's best interest finding. At this stage, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In making the best interest determination, a court "shall" consider the following factors:

"(a) the physical safety and welfare of the child, including food, shelter, health and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachment, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West Supp. 2021).

No single factor is determinative. See *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 56. The court may also consider "the nature and length of the child's relationship with [his] present caretaker and the effect that a change in placement would have upon [his] emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The court need not explicitly reference each factor when making its decision. *Id.*

¶ 39    We find the circuit court did not err in its best interest finding, as there was sufficient evidence in the record to balance the statutory factors in favor of termination. Everado testified that he and his wife both loved L.G. and wanted to adopt him. Selph testified that their home was safe and appropriate, and Everado and his wife ensured L.G.'s special needs were met. The testimony also suggested L.G. is well integrated into Everado's family, with whom he had lived for over three years, and demonstrated strong bonds with Everado and his wife. Citing this record, the court emphasized the stability of the placement and L.G.'s need for permanency, along with the provision for L.G.'s special needs, in finding termination was appropriate. It also highlighted the lack of permanency in Alberto's situation, given his remaining need for substance abuse and domestic violence services. Each of these considerations is appropriate per the statute and supported by the record, and a reasonable court could weigh these factors in favor of termination. See 705 ILCS 405/1-3(4.05)(d), (g), (i), and (j) (West Supp. 2021).

¶ 40    In arguing the circuit court erred, Alberto first contends the records shows the court failed to consider a specific relevant factor—that he and L.G. were bonded. This argument fails because while the court did not explicitly reference the evidence of a bond between L.G. and Alberto in rendering its decision, it is well-established that the court was not required to do so, and there is no indication from the record that the court specifically discounted this factor. See *Tajannah O*, 2014 IL App (1st) 133119, ¶ 19. To the extent Alberto argues the court improperly weighed this factor, this argument also fails because while a bond with the biological parent is a relevant concern, it does not predominate over the other statutory factors, none of which are singularly determinative. *Curtis W.*, 2015 IL App (1st) 143860, ¶ 56. As discussed above, the record was sufficient for the court to find that termination of Alberto's parental rights was in L.G.'s best interest given the circumstances with L.G.'s foster parents, and this means reversal on manifest

weight review is inappropriate, even where there is evidence in the record which also weighs against termination. See *D.T.*, 212 Ill. 2d at 364 (a child's need for stability is of central importance to the best interest determination); *A.R.*, 2023 IL App (1st) 220700, ¶ 77.

¶ 41    Alberto cites *In re Angela D.*, 2012 IL App (1st) 112887, but the case is counter to his position. There, another panel of this court upheld the termination of parental rights despite evidence of a bond between the biological mother and child. See *Angela D.*, 2012 IL App (1st) 112887, ¶¶ 39-42. As the *Angela D.* court helpfully explained, the weight of a child's bond with their biological parent may outweigh other factors in situations where there is "no evidence that any benefit or increased stability would inure to the children upon termination." *Id.* ¶ 39. In L.G.'s case, there are obvious benefits, including increased stability, from his adoption.

¶ 42    Alberto next argues the best interest finding was against the manifest weight of the evidence because the record suggests L.G.'s foster parents will not allow continued contact between Alberto and L.G. post-adoption. We note that the State and public guardian claim in their briefs that Alberto misstates the record on this issue, citing Selph's testimony that the foster parents had previously suggested they would be willing to maintain contact. We agree with Alberto on the proper characterization of the record—Everado testified that the decision on whether to maintain contact between L.G. and Alberto would only be made after adoption was finalized, meaning Alberto's concern about whether future contact will be permitted is legitimate.

¶ 43    Even given the existence of this concern, however, we disagree that this presents a valid basis for reversing the circuit court's finding. Again, it is not this court's role to re-weigh evidence and reach the result we think would be appropriate; it is to determine if the result the lower court reached was reasonably supported by the record. See *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002). And as discussed above, the circuit court's best interest finding had support in the record, making

reversal improper even if cessation of contact with L.G.'s biological parents was a possibility. In so finding, we note this situation is different from the cases Alberto cites where the record contained strong evidence that the severing of the bond between a child and their biological parent would do active harm to the child, such as testimony from a therapist or social worker opposing termination. See *In re D.T.*, 338 Ill. App. 3d 133, 155 (2003), *aff'd in part & rev'd in part*, 212 Ill. 2d 347 (2004); *In re M.F.*, 326 Ill. App. 3d 1110, 1118 (2002); *In re B.C.*, 247 Ill. App. 3d 803, 807 (1993). Alberto offered no such evidence into the record.

¶ 44    Finally, we reject Alberto's argument that the circuit court's decision was against the manifest weight of the evidence because it did not ensure that L.G. could maintain contact with his siblings per 20 ILCS 505/7.4(i)(4) (West Supp. 2023) (providing that when "a permanency goal of adoption or private guardianship" is in place, but before finalization, the parties may make a "Post Permanency Sibling Contact Agreement"). This requirement arises after a permanency goal of adoption or guardianship is entered, and was not at issue at the June 24, 2024 proceeding.

¶ 45                                 CONCLUSION

¶ 46    The circuit court's finding that Alberto did not act with reasonable responsibility, and was thus unfit, had ample support given his repeated substance abuse and domestic violence issues, and the best interest decision was supported by the record demonstrating L.G.'s foster parents provided an appropriate, safe, and loving home, and accounted for his special needs. Accordingly, we affirm the court's orders.

¶ 47    Affirmed.